Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6434 | **DATE** | 3/24/2004 |
| **CASE TITLE** | Knafel vs. Chicago Sun Times Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion to dismiss is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 2 5 2004 | |
| | Notified counsel by telephone. | | date docketed | 13 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TH ✓ | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials | |

KARLA K. KNAFEL, )
)
Plaintiff, )
)
v. )
) No. 03 C 6434
CHICAGO SUN-TIMES, INC., and )
SUN-TIMES ONLINE, )
)
Defendants. )

DOCKETED
MAR 2 5 2004

MAR 2 5 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

Defendants Chicago Sun-Times, Inc. and Sun-Times Online have moved to dismiss the claim of Plaintiff Karla Knafel pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons set forth below, their motion is granted.

## FACTUAL BACKGROUND

Knafel is a citizen of California. (R.1-1, Compl. ¶ 1.) Chicago Sun-Times, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois, and Knafel alleges on information and belief that Sun-Times Online is its wholly owned subsidiary. (*Id.* at ¶ 2-3.) Chicago Sun-Times, Inc. publishes and sells the *Chicago Sun-Times* ("the *Sun-Times*"), a daily newspaper, and Sun-Times Online publishes and distributes an online version of the *Sun-Times*. (*Id.*)

Knafel sues the Defendants in diversity, seeking damages for defamation. Her complaint asserts four counts of defamation *per se* against Defendants. Her claims arise entirely from a column entitled *Is Karla Knafel's affection really worth $5 million?*, which both the print and

online versions of the *Chicago Sun-Times* published on June 10, 2003. Knafel claims that the column falsely states that she has committed the criminal offense of prostitution, and thus is defamatory *per se* under Illinois law.

The column, written by journalist Richard Roeper, discusses an Illinois state court lawsuit filed against Knafel by professional basketball star Michael Jordan. (R. 1-1, Compl. ¶ 6.) That lawsuit alleged that Knafel and Jordan had had a relationship several years ago, and that Knafel later attempted to extort five million dollars from Jordan. (*Id.*) Knafel filed a countersuit claiming that Jordan actually owed her this money. She claimed she entered an alleged contract with Jordan in which Jordan offered to pay Knafel five million dollars when he retired from playing basketball, in return for Knafel's promise not to file a paternity suit against him or publicly reveal their relationship. (*Id.*) When the *Sun-Times* published Roeper's column, the trial court had not yet issued a final decision in the case. (*See id.* at Ex. A.)

The column begins with Roeper's description of a scene that he observed at a Los Angeles nightspot, where he saw "a major movie star" swarmed by admiring female fans—many, according to Roeper, "behaving in a way that indicated they'd be willing to have a physical encounter with the movie star after an unusually short courtship." (R. 1-1, Compl. Ex. A.) It continues with a generalized disquisition on the topic of female admirers pursuing male celebrities, and segues into a more particularized discussion of Knafel and Jordan's relationship:

> What do female groupies expect to get from these encounters? Well, sex. Some want to be able to say they bedded a celebrity. Others are hoping against hope for true love, or at least an affair that will make them semi-famous. *And, of course, there are some women who see a famous horny guy, blink their eyes and hear the ka-ching of a cash register. Women like Karla Knafel.*"

(*Id.* (emphasis added).)

2

Roeper's column then describes the circumstances surrounding Jordan's lawsuit against Knafel described above, stating that Knafel claimed that "Michael Jordan promised to pay her $5 million not to discuss their affair." (*Id.*) The column then quotes a passage from Knafel's countersuit, as well as public comments that Knafel made during the state court proceeding and to reporters. The closing paragraphs of the column address these comments, in which Knafel described herself as "saddened and shocked" that Jordan would not honor their alleged contract:

> In other words, you had sex with a famous, wealthy man, and you claim he promised to pay you $5 million to keep quiet about it, and now you want your money. That just exudes class, doesn't it? When Knafel's children are older, they'll be so proud to read the news clippings about mom. Knafel was once an aspiring singer. She's now reportedly a hair designer. *But, based on the money she's been paid already and the additional funds she's seeking in exchange for her affair with Jordan, she's making herself sound like someone who once worked in a profession that's a lot older than singing or hair designing.*"

(*Id.* (emphasis added).)

## ANALYSIS

### I.  Legal Standard

The purpose of a motion to dismiss under Rule 12(b)(6) is to "test the sufficiency of the complaint, not to decide the merits" of the case. *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court views "the complaint in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in his or her favor." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003) (citations omitted). Dismissal is appropriate only where it appears beyond doubt that under no set of facts would plaintiff's allegations entitle her to relief. *See Hernandez v. City of Goshen*, 324 F.3d 535, 537 (7th Cir.

3

2003).

In order to state a claim for defamation per se, Knafel need only satisfy the notice pleading requirements of Federal Rule of Civil Procedure 8. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 926 (7th Cir. 2003). "All the complaint need do to withstand a motion to dismiss for failure to state a claim is 'outline or adumbrate' a violation of the statute or constitutional provision upon which the plaintiff relies." *Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir. 1992).

## II. Defamation *Per Se*

Under Illinois law, a statement is defamatory "if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Van Horne v. Muller*, 185 Ill. 2d 299, 307, 705 N.E.2d 898, 903 (1998). A defamatory statement is actionable *per se* "when the defamatory character of the statement is apparent on its face; that is, when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10, 607 N.E.2d 210, 206 (1992). *See also Gardner v. Senior Living Sys., Inc.*, 314 Ill. App. 3d 114, 246 Ill. Dec. 822, 731 N.E.2d 350, 354 (2000). One category of statements considered defamatory *per se* are "words which impute the commission of a criminal offense." *Kolegas*, 607 N.E.2d at 206.

### A. The Rule of Innocent Construction

Even if a statement may be interpreted as imputing the commission of a crime, a plaintiff cannot maintain an action for defamation *per se* if the statement "is reasonably capable of an innocent construction." *Kolegas*, 154 Ill. 2d at 11, 607 N.E.2d at 206. The common-law rule of

4

innocent construction "requires courts to consider a written or oral statement in context, giving the words and implications therefrom their natural and obvious meaning." *Id.* In the case of statements allegedly imputing commission of a criminal offense, "the words charging the commission of a crime need not meet the technical requirements which are necessary for an indictment, [but] the words must fairly impute the commission of a crime." *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 46, 684 N.E.2d 935, 947 (Ill. App. Ct. 1997).

In Illinois courts, the issue of innocent construction is a question of law for the court. In federal court, the Seventh Circuit recently clarified that "[a]llocation of functions between judge and jury in federal court, however, are a matter of federal law. Moreover, facts beyond those that appear in a federal complaint may be relevant to the reasonableness inquiry, which requires that statements be read in their natural sense, not in the light most favorable to the defendant." *Muzikowski*, 322 F.3d at 924-25.[1] Following *Muzikowski*[2], the applicability of the rule of

---

[1] Inexplicably, neither party cited *Muzikowski*, a recent Seventh Circuit case qualifying Illinois's blanket rule that the applicability of the rule of innocent construction is a matter of law to be resolved by a court. *Muzikowski*, 322 F.3d at 924-25.

[2] The Court also notes that the district court on remand in *Muzikowski* interpreted that decision more broadly than the Court does today. *See Muzikowski v. Paramount Pictures Corp.*, No. 01 C 6721, 2003 WL 22872117, at *1 (N.D. Ill. Dec 3, 2003) (interpreting the Seventh Circuit's opinion to hold that, "because of the different standards of pleading in the Illinois state and federal courts, the innocent construction rule cannot be applied on a motion to dismiss"). This Court respectfully disagrees with the broader interpretation, and notes that the Seventh Circuit stated that Illinois state courts applied a heightened standard of pleading only "for complaints basing [defamation] claims on publications that do not literally name the plaintiff." *Muzikowski*, 322 F.3d at 925-26. Furthermore, no other district court has read *Muzikowski* as precluding the application of the innocent construction rule on a motion to dismiss. *See, e.g., DSC Logistics, Inc. v. Innovative Movements, Inc.*, No. 03 C 4050, 2004 WL 421977, at *1 (N.D. Ill. Feb. 17, 2004); *Walker v. Braes Feed Ingredients, Inc.*, No. 02 C 9236, 2003 WL 1956162, at *2-*3 (N.D. Ill. April 3, 2003) (both granting motions to dismiss based on a reasonable innocent construction of allegedly defamatory statements).

5

innocent construction in federal court is one for the Court. The Court should not grant a motion to dismiss based on the rule, however, if evidence outside of that alleged in the complaint might be relevant to reading the allegedly defamatory statements "in their natural sense." *Id.* "However, if a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail." *Id.*

### B. The Allegedly Defamatory Statements

Knafel claims that Roeper's column is defamatory *per se* because it falsely imputes to her the commission of prostitution. In Illinois, "[a]ny person who performs, offers or agrees to perform any act of sexual penetration . . . for any money, property, token, object, or article or anything of value . . . commits an act of prostitution." 720 ILCS 5/11-14 (2003). In her pleadings, Knafel identifies three allegedly defamatory statements, which are emphasized in the block quotes above. Read in conjunction, Knafel claims, the statements unambiguously state that "Knafel intended to and did trade sex for money with Jordan." (R. 9-1, Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss, 3). The first statement is drawn from the first block quote: "[O]f course, there are some women who see a famous horny guy, blink their eyes, and hear the ka-ching of a cash register. Women like Karla Knafel." According to Knafel, this is, in the context of the rest of the article, a statement that "Karla Knafel had sex with a 'horny' Michael Jordan in return for money." (*Id.* at 2).

The second two statements are drawn from a single sentence in the second block quote: "[B]ased on the money she's been paid already and the additional funds she's seeking in exchange for her affair with Jordan, she's making herself sound like someone who once worked in a profession that's a lot older than singing or hair designing." Knafel claims that Roeper

6

makes two contentions here: first, that she traded sex for "funds" received from Jordan, and second, that she was once a member of the proverbial "world's oldest profession"— *i.e.*, prostitution. (*Id.* at 2).

### C. Applying the Rule of Innocent Construction

In their pleadings, Defendants raise a host of arguments against Knafel's claims. This Court finds at least one of them dispositive, and holds that the statements identified by Knafel are not, as a matter of law, defamatory *per se* because of the rule of innocent construction.[3]

The chief deficiency in Knafel's claim is that, to be defamatory *per se*, the allegedly defamatory statements must impute commission of the actual crime of prostitution.[4] In Illinois, prostitution is the bargained-for exchange of discrete sexual favors for money or other valuable consideration. *See* 720 ILCS 5/11-14 ("Any person who performs, offers or agrees to perform any act of sexual penetration . . . for any money, property, token, object, or article or anything of value . . . commits an act of prostitution."). Under this definition, one who simply enters into or continues a sexual relationship with the hope of some indefinite economic reward has not committed prostitution. Within the context of the rest of the column, which describes Knafel's efforts to enforce a contract for non-disclosure of her relationship with Jordan, the statements suggest that Knafel might have sought access to Jordan's wealth, but not necessarily through the

---

[3] Because this issue is dispositive, the Court need not address the other issues raised by Defendants.

[4] Knafel does not seem to entirely grasp this point, given her citation to the *Black's Law Dictionary* definition of "prostitution" as meaning "commercialized sex." (R.9-1, Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss, 6). This definition may provide a composite description of the law across many jurisdictions, but is not in and of itself the law in Illinois or any other jurisdiction. It is therefore irrelevant as to whether the column imputed to Knafel the commission of an act that is illegal in Illinois.

7

bargained-for exchange of money for discrete sexual favors. Given that the context of the statements is clear — they appeared in a widely-distributed newspaper column that clearly identified Knafel — no further evidence is necessary to show that, in their "natural sense," *Muzikowski*, 322 F.2d at 924-25, the statements may be reasonably read to impute to Knafel avarice rather than the commission of prostitution.

First, the statement that Knafel is the type of woman who "blink[s] her eyes and hear[s] the ka-ching of a cash register" when she sees a male celebrity is susceptible to an innocent interpretation because it can reasonably be construed to mean that Knafel is aware that an affair with a celebrity like Jordan might bring economic awards other than an overt exchange of money for discrete sex acts — through a non-disclosure contract, for example.

Second, the statement that Knafel had received money, and wished to receive more, "in exchange for her affair with Jordan" is reasonably read as referring to the column's preceding discussion of Knafel's attempt to enforce the alleged non-disclosure agreement. Earlier, the column relates Knafel's claim that "Michael Jordan promised to pay her $5 million not to discuss their affair," and discusses Knafel's attempt to enforce that alleged promise. As such, it is reasonable to read the statement as meaning that Knafel received money "for her affair with Jordan" in the form of an after-the-fact payment designed to induce silence, rather than in the form of a bargained-for payment for discrete sexual favors. Moreover, the column explicitly states that Knafel received money "for her affair" with Jordan, not for the performance of discrete sexual favors. The innocent interpretation is further supported by Knafel's treatment of the statement in her complaint. While Knafel emphasized in italics the first and third statements that she argued to be defamatory in her later pleading, she did not emphasize this second

8

statement. (*See* R. 1-1, Compl. ¶3). This lack of emphasis suggests that Knafel herself simply read the statement as referring to her attempt to enforce the non-disclosure agreement.

The third statement, that Knafel is "making herself sound like someone who once worked in a profession that's a lot older than singing or hair designing," is also susceptible to an innocent construction. The column does not actually state that Knafel was ever a prostitute. Had the column stated that Knafel had worked in the world's oldest profession, there would be little doubt that it imputed to her the commission of prostitution. The column instead states that Knafel's actions make her appear "like" someone who was once a prostitute. To be "like" someone is to be similar to, or to resemble, that person. *See American Heritage Dictionary* (4th ed. 2000). In the context of the rest of the column, it is reasonable to read this statement as embodying Roeper's subjective moral judgment that Knafel's activities in engaging in a sexual relationship with Jordan and attempting to enforce their alleged non-disclosure agreement display a character trait that Roeper believes Knafel shares with prostitutes – namely, a willingness to use sex to secure economic reward. While it may impute a socially undesirable quality to Knafel, the sentence, by its plain language, states not that Knafel was ever a prostitute, but that she might have been *like* one.

Knafel's response to Defendants' argument that the statements in the column are susceptible to an innocent construction is unpersuasive. First, Knafel's conclusion that the above statements are expressions of fact is irrelevant to whether they are susceptible to an innocent interpretation. Second, the cases she cites miss the mark. In *Quiroz v. Hartgrove Hospital*, No. 97 C 6515, 1999 WL 281343, at *14 (N.D. Ill. Mar. 24, 1999), the defendant called the plaintiff a "night crawler," "prostitute," "whore," and "hooker." As stated in the court's opinion, the

defendant could offer "no plausible non-defamatory interpretation or context for 'prostitute.'" *Id.* at *16. By contrast, the above statements are reasonably construed as imputing to Knafel mercenary actions that do not amount to the commission of prostitution. *Bryson* is also inapposite. While *Bryson* also dealt with defamation *per se*, the plaintiff there alleged that the defendant's description of her as a "slut" fell into a completely different category of defamatory *per se* comments — namely, statements that falsely accuse the plaintiff of fornication or adultery. *Bryson*, 174 Ill. 2d at 89, 672 N.E.2d at 1215.

By contrast, Defendants cite to several occasions when Illinois courts have found statements more definitely implying the commission of a crime to be reasonably susceptible to an innocent construction. For example, in *Adams*, the court found that a statement that the plaintiff had been involved in "past offenses in other places along with cars, something to do with car theft" was not defamatory per se because it did not "clearly and definitively refer to a specific offense." *Adams*, 292 Ill. App. 3d at 46, 684 N.E.2d at 946. *See also Harte v. Chicago Council of Lawyers*, 220 Ill. App. 3d 255, 261, 581 N.E.2d 275, 279 (Ill. App. Ct. 1991) (holding statement that the plaintiff, an attorney, was "implicated in Operation Graylord" not defamatory *per se* because it did not necessarily accuse plaintiff of any particular crime). Compared to these precedents, the statements in Roeper's column are even less definite in their imputation of a crime.[5]

---

[5] Even after *Muzikowski*, these Illinois cases are appropriate precedent in this case because the Court need not look beyond the pleadings to determine the application of the innocent construction doctrine.

10

## CONCLUSION

Because she pleaded that Roeper's column was defamatory *per se*, Knafel must make a showing that the column actually imputed to her the commission of the specific offense of prostitution. While Roeper's column may cast a moral judgment on Knafel, it is, as a matter of law, reasonably susceptible to the interpretation that it goes no further. The Defendants' Motion to Dismiss is granted and Knafel's complaint is dismissed.

Dated: March 24, 2004

ENTERED

*Amy J. St. Eve*
AMY J. ST. EVE
United States District Judge